THIS OPINION IS CITABLE AS
PRECEDENT OF THE T.T.A.B.

Mailed:
May 15, 2007

# UNITED STATES PATENT AND TRADEMARK OFFICE

_____

## Trademark Trial and Appeal Board

_____

7-Eleven, Inc.
v.
Lawrence I. Wechsler

_____

Opposition No. 91117739
to application Serial No. 75543909
filed on August 27, 1998

_____

Charles R. Mandly, Jr. of Foley & Lardner LLP for 7-Eleven, Inc.

Robert E. Wechsler of Wechsler & Wechsler, P.C. for Lawrence I. Wechsler.

_____

Before Walsh, Mermelstein, and Bergsman, Administrative Trademark Judges.

Opinion by Bergsman, Administrative Trademark Judge:

Lawrence I. Wechsler filed an intent-to-use application for the mark GULPY, in standard character form, for goods ultimately identified as "portable animal water dishes and animal water containers sold empty."[1]

7-Eleven, Inc. opposed the registration of applicant's mark on the ground of priority of use and likelihood of confusion in accordance with Section 2(d) of the Lanham

---

[1] Application Serial No. 75543909, filed August 27, 1998.

Act, 15 U.S.C. §1052(d). Subsequently, opposer amended its Notice of Opposition to include dilution in accordance with Sections 13(a) and 43(c) of the Lanham Act, 15 U.S.C. §§1063(a) and 1125(c).

The opposition has been fully briefed.

The Record

By operation of the rules, the record includes the pleadings and the application file for the GULPY trademark. The record also includes the testimony and other evidence introduced by the parties, as set forth below.

A.   Opposer's evidence.

1.   Testimony deposition of Jean Olsen, legal assistant for the Wildman, Harrold, Allen & Dixon law firm, with attached exhibits;

2.   Testimony deposition of John Ryckevic, opposer's Director of Propriety Beverages, with attached exhibits;

3.   Notice of reliance on nine (9) federal trademark registrations pursuant to Trademark Rule 2.122(d)(2);

4.   Notice of reliance on printed publications purportedly evidencing the "public association of GULP Marks with 7-Eleven" pursuant to Trademark Rule 2.122(e);

5.   Two notices of reliance on printed publications purportedly evidencing "the number of people that have seen

certain films that prominently feature 7-Eleven's famous GULP marks" pursuant to Trademark Rule 2.122(e);[2]

6.    Notice of reliance on applicant's responses to opposer's interrogatories pursuant to Trademark Rule 2.120(j)(3)(i);

7.    Notice of reliance on applicant's Memorandum in Response to Opposer's Motion for Summary Judgment and the attached declarations as statements against interest pursuant to Trademark Rule 2.122 and TBMP §706.02;[3] and,

---

[2] Printed publications made of record by notice of reliance under 37 CFR §2.122(e) are admissible and probative only for what they show on their face, not for the truth of the matters contained therein, unless a competent witness has testified to the truth of such matters. *Food Products, Inc. v. Swift & Co.,* 194 USPQ 299, 301 n.2 (TTAB 1977)(publications are limited to their face value because there is no opportunity to ascertain the basis for the information or to confront and cross-examine the individuals responsible for the information); *Exxon Corp. v. Fill-R-Up Systems, Inc.,* 182 USPQ 443, 444 (TTAB 1974)(articles from trade publications are admissible to show that they appeared in the publication and that they contained certain information, but not that the information was true).  Therefore, while the printed publications are of record, they may not be considered for the purpose stated by opposer.

[3] We note that in the current version of the TBMP, there is no section 706.02.  It would appear that opposer might be referring to what is now TBMP §704.06(b)(2nd ed. rev. 2004).  Opposer's own file copy of documents from a Board proceeding, such as applicant's opposition brief to opposer's summary judgment motion, do not constitute official records. *Weyerhaeuser Co. v. Katz,* 24 USPQ2d 1230, 1233 (TTAB 1992); *Osage Oil & Transportation, Inc. v. Standard Oil Co.,* 226 UPSQ 905, 906 n.5 (TTAB 1985).  While applicant did not object to the notice of reliance, he did not in any way treat it as being of record. Under these circumstances, there is no basis upon which we can interpret applicant as having stipulated to his opposition brief being of record.  Therefore, we will not consider the brief and its exhibits.  However, had we, in fact, considered applicant's opposition brief, the information in the attached declarations of Vickie Crawford and applicant, Lawrence Wechsler, provided information favorable to applicant regarding his intent in adopting the GULPY trademark.

8.   Notice of Reliance on printed publications regarding "national domain name practice."

B.   <u>Applicant's evidence</u>.

Testimony deposition of Lawrence I. Wechsler, the applicant, with attached exhibits.

<u>Findings of Fact</u>

Opposer is a convenience store chain with approximately 5,300 stores (*i.e.,* 2,100 corporately run stores and 3,100 franchise stores).[4]  The BIG GULP trademark and other "Gulp" marks are used to identify opposer's fountain drink program.[5]  The BIG GULP fountain drink was introduced in 1978.[6]  Opposer's "Gulp" fountain drinks include the following products:

1.   GULP for the 16 ounce drink;

2.   BIG GULP for the 32 ounce drink;

3.   SUPER BIG GULP for the 44 ounce drink; and,

4.   DOUBLE GULP for the 64-ounce drink.[7]

---

[4] Ryckevic Dep., p. 49.  Opposer did not submit any testimony or other evidence describing its business.  Nevertheless, we note that a convenience store is "a small retail store that is open long hours and that typically sells staple groceries, snacks, and sometimes gasoline."  Dictionary.com (v 1.1) based on <u>The American Heritage Dictionary of the English Language</u> (4th ed. 2000).  We may take judicial notice of dictionary definitions, including online dictionaries that exist in printed format or have regular fixed editions.  *In re Red Bull GmbH,* 78 UPSQ2d 1375, 1377 (TTAB 2006).
[5] Ryckevic Dep., p. 7.
[6] Ryckevic Dep., p. 10.
[7] Ryckevic Dep., pp. 7-8.  Applicant periodically uses the MINI GULP for new products applicant wants customers to sample. Ryckevic Dep., pp. 8 and 14.

Opposer continually adds new products to its "Gulp" line (*e.g.,* X-TREME GULP, a 52 ounce insulated, refillable mug, CAR GULP, a mug that fits in a car cup holder),[8] and it has expanded the "Gulp" line of products to include CANDY GULP for candy, GARDEN GULP for salads, and FRUIT GULP for a cup of fruit.[9] Opposer is the owner of nine (9) registered trademarks, including Registration No. 1,110,172 for the mark BIG GULP and Registration No. 1,586,016 for the mark GULP both for "soft drinks for consumption on or off the premises."

Opposer claims to be an innovator in the fountain drink product line as exemplified by the introduction of the self-serve feature for its "Gulp" line of fountain drinks.[10] In addition, opposer was the first retailer to offer both Pepsi and Coke brand products through its "Gulp" line of products.[11] Opposer also participates in national and local promotions with other organizations (*e.g.,* Major League Baseball, NASCAR, the local zoo, etc.) using collector cups in connection with one of the GULP trademarks.[12]

Opposer's sales for its "Gulp" line of fountain drinks have averaged in excess of $180,000,000 per year from 1985

---

[8] Ryckevic Dep., pp. 19-20; Exhibit 1, pp. 21-25.
[9] Ryckevic Dep., pp. 47-48; Exhibit 1, pp. 54-57.
[10] Ryckevic Dep., pp. 8-9.
[11] Ryckevic Dep., p. 9.
[12] Ryckevic Dep., pp. 16-17; Exhibit 1, pp. 15A-18B and 20.

through 2001.[13] In 2001, opposer sold 1.3 million X-TREME GULP mugs.[14]

Opposer conducts in-store advertising through backlit signs on the fountain machines or through in-store signs and/or window banners. Through the backlit advertising, opposer advertises promotions, such as collectors' cups, combo meals, etc.[15] Also, opposer advertises nationally on radio and television and through the Internet.[16] Opposer changes its fountain drink advertising programs every 30 to 60 days.[17] The "Big Gulp" trademark is featured on collateral merchandising products such as phone cards, flying discs, and hats.[18]

Opposer has actively sought to place its "Gulp" line of products in movies and television programs.[19] Opposer has had one of its "Gulp" products appear in various movies,

---

[13] Ryckevic Dep., pp. 21-22, Exhibit 2. While opposer's sales revenues were marked confidential, opposer published the average sales figure referenced above in its trial brief without any restriction or limitation. Opposer's Trial Brief, p. 4.

[14] Ryckevic Dep., pp. 22-23.

[15] Ryckevic Dep., pp. 23-25; Exhibit 1, pp. 26, 27, 29, 32, and 35.

[16] Ryckevic Dep., pp. 24, 26-35; Exhibits 1 (pp. 38-46), 3, 4, 5, 6, 7.

[17] Ryckevic Dep., p. 26.

[18] Ryckevic Dep., pp. 36-37; Exhibit 1, pp. 47-48.

[19] A movie product placement involves featuring one's product in a movie or television program. For example, if the characters in a movie are having a fountain drink, opposer seeks to have the characters drinking a BIG GULP soda. Ryckevic Dep., pp. 40-41.

*inter alia,* <u>Reality Bites</u>, <u>American Pie</u>, and <u>Pretty Woman</u>, as well as several television programs.[20]

On July 13, 2001, the radio program <u>All Things Considered</u> by National Public Radio featured a segment on opposer's X-TREME GULP.[21]

Opposer often advertises many of its "Gulp" products together to let customers know that "[t]here's a family of vessels that the customers can enjoy"[22] together.

Opposer has spent millions of dollars in advertising and promoting its "Gulp" line of products since 1983.[23]

In the early 1990's, opposer authorized M/A/R/C Inc., a research company, to conduct a brand recognition study for the BIG GULP trademark.[24]  This was not a consumer survey conducted for this legal proceeding.  It was a market study commissioned by opposer for use in its business.  The study showed that the BIG GULP trademark had an unaided awareness of 73% among consumers in general.[25]

---

[20] Ryckevic Dep., pp. 40-44; Exhibits 9, 10 and 14; Olsen Dep., pp. 22-26; Exhibits 27-33.
[21] Olsen Dep., pp. 21-22; Exhibits 25 and 26.
[22] Ryckevic Dep., pp. 38-39, Exhibit 1, pp. 26, 30, 32, and 34-36.
[23] Ryckevic Dep., pp. 35-36; Exhibit 8.  While opposer's advertising expenses were marked confidential, opposer published the expenditures referenced above in its trial brief without any restriction or limitation.  Opposer's Trial Brief, p. 6.
[24] Ryckevic Dep., pp. 45-46; Exhibit 12.
[25] Although applicant lodged an objection to the admissibility of the market research report during Mr. Ryckevic's deposition, applicant did not renew its objection in his trial brief.  In fact, in his brief, applicant acknowledged the study and criticized it as demonstrating that the public recognition and renown for the BIG GULP trademark is limited to beverages. Applicant's Brief, pp. 4-5.  Because applicant has not reasserted

The GULPY mark was first used in commerce on March 29, 2001 in connection with a portable pet water dispenser, and the mark has been in continuous use on the products since that date.[26] Applicant has sold in excess of 200,000 GULPY pet water dispensers to customers in virtually every state.[27] Applicant is unaware of any reported instances of confusion with opposer's "Gulp" line of products.[28]

The GULPY portable animal water dish and container is intended to be used and reused over an extended period of time. The suggested retail price of the product is $10.99.[29]

Applicant intends to sell GULPY portable animal water dishes and water containers "in all channels of trade normally used for pet food, pet related products and supplies."[30] "Presently, [applicant is] selling to individual pet dealers and distributors of pet products to pet dealers."[31] Approximately 12 distributors sell the

---

his objection in his brief, we have considered the evidence for whatever probative value it may have. TMBP §707.04 ("by failing to preserve the objection in its brief on the case, a party may waive an objection that was seasonably raised at trial").
[26] Wechsler Dep., pp. 6, 8-9, and 70.
[27] Wechsler Dep., pp. 9, 70, 97-98, and 100-101.
[28] Wechsler Dep., pp. 17-18 and 96-98; Wechsler Dec., ¶6.
[29] There is no evidence regarding the price of applicant's product. However, in their briefs, both parties assume that the price of applicant's portable pet water container is $10.99. We will therefore assume that the price of applicant's product has been stipulated into evidence.
[30] Applicant's Responses to Opposer's Interrogatories, Interrogatory No. 3.
[31] Wechsler Dep., pp. 9-10.

GULPY pet water dispenser.[32]  Applicant estimates that his GULPY pet water dispenser is sold at over 1,500 pet stores, including PetSmart and Pet Supplies Plus.[33]

Since 2001, applicant has exhibited the GULPY pet water dispenser at trade shows, including the HH Backer trade shows in Chicago and Atlantic City, as well as the American Pet Product Manufacturers Association show.[34]  Applicant also advertises the product on the Internet.[35]  "From time to time, [applicant] runs ads in various trade publications," such as *Pet Product News,* and it mails flyers to potential customers.[36]

## Standing

Opposer's evidence of its ownership of its "Gulp" registrations and of its use of various marks containing the word "Gulp" shows that opposer is not a mere intermeddler. Therefore, opposer has established its standing.  *Cunningham v. Laser Golf Corp.,* 222 F.3d 943, 55 USPQ2d 1842, 1844 (Fed. Cir. 2000); *Lipton Industries, Inc. v. Ralston Purina Co.,* 670 F.2d 1024, 213 USPQ 185, 189 (CCPA 1982).

## Priority

Because opposer's pleaded registrations are of record, priority is not in issue.  *King Candy Company v. Eunice*

---

[32] Wechsler Dep., p. 11.
[33] Wechsler Dep., pp. 10 and 73.
[34] Wechsler Dep., pp. 11 and 91-92.
[35] Wechsler Dep., pp. 11-12; Exhibit 2.
[36] Wechsler Dep., pp. 16 and 95.

*King's Kitchen, Inc.,* 496 F.2d 1400, 182 USPQ 108, 110 (CCPA 1974).

Likelihood of Confusion

Our determination of likelihood of confusion is based on an analysis of all of the probative facts in evidence that are relevant to the factors set forth in *In re E. I. du Pont de Nemours & Co.,* 476 F.2d 1357, 177 USPQ 563, 567 (CCPA 1973). *See also, In re Majestic Distilling Co., Inc.,* 315 F.3d 1311, 65 UPSQ2d 1201, 1203 (Fed. Cir. 2003).

A.   Family of Marks.

In our likelihood of confusion analysis, we first consider opposer's claim to ownership of a family of marks characterized by the word "Gulp" or  "_____ Gulp" formative marks (hereinafter the "'Gulp' surname").[37]

> A family of marks is a group of marks
> having a recognizable common
> characteristic, wherein the marks are
> composed and used in such a way that the
> public associates not only the
> individual marks, but also the common
> characteristic of the family, with the
> trademark owner.  Simply using a series
> of similar marks does not of itself
> establish the existence of a family.
> There must be recognition among the
> purchasing public that the common

---

[37] Although opposer did not plead a family of marks in its Amended Notice of Opposition, it raised the issue in its brief. Applicant did not object to opposer's claim of ownership to a family of marks and, in fact, applicant argued in his brief how his GULPY mark does not incorporate the "Gulp" surname. Accordingly, we consider the Notice of Opposition to be amended to conform to the evidence and to include a claim that opposer is the owner of a "Gulp" family of marks used in connection with fountain drinks.  Fed.R.Civ.P. 15(b).

10

> characteristic is indicative of a common
> origin of the goods.

*J & J Snack Foods Corp. v. McDonald's Corp.,* 932 F.2d 1460, 18 USPQ2d 1889, 1891 (Fed. Cir. 1991).

Recognition of the family is achieved when the pattern of usage of the common element is sufficient to be indicative of the origin of the family. *Id.* In addition, any evidence pertaining to consumer reaction and exposure to the family is probative of the association of common ownership. *Witco Chemical Co. v. Chemische Werke Witten GmbH,* 158 USPQ 157, 160 (TTAB 1968).

As with any trademark, the rights appurtenant to the family exist in connection with the goods or services with which the marks are used. *Merritt Foods Co. v. Americana Submarine,* 209 USPQ 591, 597 (TTAB 1980)("the rationale for the 'family of marks' theory is that a party has in effect established a 'secondary meaning' in a term which serves as the characteristic feature of a number of marks used and promoted together by him **in his field of endeavor**, so that the subsequent use by another party of a mark containing this term **for like or related goods** would be likely to create an association of the later mark with the prior user and/or his 'family of marks'.")(emphasis added); *Medical Modalities Associates, Inc. v. ARA Corp.,* 203 USPQ 295, 301

11

(TTAB 1979); *Porta-Tool, Inc. v. DND Corp.,* 196 USPQ 643, 649 (TTAB 1977).

The issues we must determine include the following:

1. Whether opposer owns a family of "Gulp" marks;

2. Whether applicant's mark GULPY incorporates the "Gulp" surname; and,

3. Whether recognition of the "Gulp" surname carries over to portable pet water dishes.

We believe that the evidence establishes that opposer has a family of "Gulp" marks used in connection with fountain drinks. First, there is some evidence that opposer advertises its "Gulp" marks together. For example, when opposer's customers serve themselves, they must select the appropriate cup. Ryckevic Dep. Exhibit 1, p. 26 is an example of a counter display where the BIG GULP, SUPER BIG GULP, and DOUBLE GULP sizes are offered together as menu selections. Ryckevic Dep. Exhibit 1, pp. 30, 32, and 34-36 are representative examples of opposer's advertisements for multiple "Gulp" fountain drinks. The testimony of Mr. Ryckevic implies that the purpose of using "Gulp" as a common term in connection with opposer's fountain drinks is to put the "Gulp" surname in front of consumers and to make the "Gulp" trademarks as well known as possible: "[t]he verbiage that's on there [Exhibit 1, p. 34 – an in-store display promoting X-TREME GULP, SUPER BIG GULP, and BIG GULP] really kind of hits on the fact that the program is

12

not only one cup.  There's a family of vessels that the customers can enjoy."[38]

In addition, some of the printed publications make reference to opposer's various GULP marks in a way that shows that the public regards them as being part of a "Gulp" family of fountain drinks.

> [t]he Big Gulp had begotten the Super Big Gulp (42 ounces), which in 1988 gave birth to the Double Gulp (64 ounces). And now, eight years later, can an even bigger Gulp be expected?  "Maybe the next thing we'll do is offer a backpack with two straws in it," says 7-Eleven spokeswoman Karen Raskopf.  Fort Worth Star-Telegram (October 5, 1996).
>
> Until that day comes, expect to see the Quadruple Gulp and the Triple Big Bite at a 7-Eleven near you.  The Plain Dealer (November 20, 1998).
>
> If the 32-ounce Big Gulp fountain drink for 89 cents isn't big enough, 7-Eleven will sell you a 44-ounce Super Big Gulp for an extra 10 cents.
>
> But why stop there?  For a dime more, you can have the Double Gulp – a 64-ounce (half-gallon) bucket of soda-slurping pleasure.  The Boston Herald (May 23, 1999).

Accordingly, we find that opposer has established a family of marks based on the word "Gulp."  Applicant does not seriously dispute this as applicant argues, as we noted in footnote 37, that his GULPY trademark does not incorporate the "Gulp" surname and that opposer's "Gulp"

---

[38] Ryckevic Dep., p. 38.

marks are limited to food products, and do not cover pet products.[39]

In comparing opposer's family of marks with applicant's mark, the question is not whether applicant's mark is similar to opposer's individual marks, but whether applicant's mark would be likely to be viewed as a member of opposer's "Gulp" family of marks. *The Black & Decker Corporation v. Emerson Electric Co.,* ___ USPQ2d ___ (TTAB March 23, 2007); *Plus Products v. Medical Modalities Associates, Inc.,* 217 USPQ 464, 465 n.8 (TTAB 1983)("purchasers familiar with plaintiff's family of marks would believe the defendant's mark is but another member of that family"). Opposer's "Gulp" family of marks consists of the word "Gulp" and the word "Gulp" preceded by a modifying adjective (*e.g.,* Big, Super Big, Double, X-Treme, etc.). Opposer's family surname, the word "Gulp," is a common word meaning "to swallow hastily, greedily, or in large amounts" or "the amount swallowed at one time."[40] Gulp is a suggestive designation in the fountain drink field, and this relationship between the word "Gulp" and opposer's fountain

---

[39] Applicant's Brief, pp. 5-6.
[40] <u>Webster's New World Dictionary of American English</u>, p. 601 (3rd ed. 1988). As indicated in footnote 4, we may take judicial notice of dictionary definitions. This particular dictionary definition was used in a document opposer sought to make of record. "Notice of Reliance on Statements Made Against Interest Contained in Applicant's Response to Opposer's Motion for Summary Judgment."

drinks dominates the commercial impression created by opposer's "Gulp" marks.  That is, the commercial impression engendered by the surname of opposer's family of marks is that opposer provides enormous quantities of liquid.[41]

On the other hand, applicant's mark GULPY is a coined word that does not incorporate opposer's family surname (*i.e.,* it is not the word "Gulp" and it is not a "___ Gulp" formative mark).  The word "Gulpy" is not constructed in the same manner as opposer's "Gulp" marks, and when applied to a portable animal water dish, it engenders a different commercial impression (*e.g.,* a puppy drinking water from a bowl or a pet's name).  *See Specialty Brands, Inc. v. Coffee Bean Distributors, Inc.,* 748 F.2d 669, 223 USPQ 1281, 1284 (Fed. Cir. 1984); *Northwestern Golf Co. v. Acushnet Co.,* 226 USPQ 240, 244 (TTAB 1985)(evidence of the context in which a mark is used is probative of the significance which the mark is likely to project).

With respect to the goods on which the parties use their marks, opposer uses its "Gulp" family of marks primarily in connection with fountain drinks sold in

---

[41] Opposer's "Notice of Reliance on Printed Publications" has numerous references to the enormous volume of opposer's "Gulp" fountain drinks.  For example:  "As any serious drink scholar will tell you, that's where the history of big drinks began, in 1980.  The Big Gulp was born when the 7-Eleven convenience-store chain replaced its 16-ounce soda cups with 32-ouncers . . . The fast-food chains, of course, were quick to get into this big-drink craze."  The Fort Worth Star-Telegram (October 5, 1996).

opposer's chain of convenience stores.[42]  In addition, opposer has expanded the use of its "Gulp" marks to include mugs, as well as candy, salads, and fruit.[43]  Applicant, on the other hand, uses its GULPY mark in connection with a portable animal water dish.  A portable animal water dish is a distinctly different product than fountain drinks, as well as their containers, candy, salad, and fruit.  Such disparate products would be bought under different circumstances and conditions and would not be encountered by the same persons under conditions likely to give rise to the mistaken belief that the products emanate from the same source.

In reaching this conclusion, we are aware that applicant's description of goods is unrestricted, and that its portable pet water dish could be sold anywhere such goods are normally sold.  Nevertheless, while opposer sells pet foods,[44] there is no evidence that it sells pet accessories[45] (or that it intends to so expand its product line), that it has used its "Gulp" family of marks on anything other than human food and accessories therefor (*i.e.,* mugs and collectible cups), that any other company

---

[42] Ryckevic Dep., p. 7.  The identification of goods in opposer's pleaded registrations is for "soft drinks for consumption on or off the premises," which, in the context of soft drinks, refers to fountain soft drinks provided by opposer at its own premises.
[43] Ryckevic Dep., pp. 19-20 and 47-48.
[44] Ryckevic Dep., pp. 50; Exhibit 13.
[45] Olsen Dep., pp. 27-28.

16

manufactures or sells fountain drinks or human food and pet foods or pet accessories under the same or confusingly similar trademarks.  Based on the record before us, neither pet food, nor pet accessories, have ever been sold or promoted together with any of opposer's "Gulp" trademarks[46] and, therefore, it cannot be said that recognition of the "Gulp" surname carries over to portable pet water dishes.

In view of the foregoing, we find that applicant's GULPY mark is sufficiently different from Opposer's "Gulp" family surname that consumers are not likely to perceive GULPY as a member of opposer's "Gulp" family of marks.

This does not, however, prevent opposer from prevailing in this proceeding if applicant's mark is likely to cause confusion with any one of opposer's previously used and registered marks.  *Moore Business Forms v. Rogersnap Business Forms,* 163 USPQ 303, 308 (TTAB 1969); *Witco Chemical Co. v. Chemische Werke Witten GmbH,* 158 USPQ 157, 161 (TTAB 1968).  In our opinion, the most pertinent of opposer's marks are GULP and BIG GULP.  Therefore, in the remainder of our analysis, we will compare those marks with applicant's mark.

B.   The fame or relative strength of opposer's marks.

We begin this portion of our analysis with the fifth *du Pont* factor that requires us to consider evidence of fame of

---

[46] Ryckevic Dep., pp. 54-55.

opposer's mark. Fame, if it exists, plays a dominant role in the likelihood of confusion analysis. *Bose Corp. v. QSC Audio Products Inc.,* 293 F.3d 1367, 63 USPQ2d 1303, 1305 (Fed. Cir. 2002); *Recot Inc. v. M.C. Becton,* 214 F.3d 1322; 54 USPQ2d 1894, 1897 (Fed. Cir. 2000); *Kenner Parker Toys, Inc. v. Rose Art Industries, Inc.,* 963 F.2d 350, 22 USPQ2d 1453, 1456 (Fed. Cir. 1992).

We note that fame for likelihood of confusion purposes and for dilution are not the same, and that fame for dilution purposes requires a more stringent showing. *Palm Bay Imports Inc. v. Veuve Clicquot Ponsardin Maison Fondee En 1772,* 396 F.3d 1369, 73 USPQ2d 1689, 1694 (Fed. Cir. 2005); *Toro Co. v. ToroHead Inc.,* 61 USPQ2d 1164, 1170 (TTAB 2001). Likelihood of confusion fame "varies along a spectrum from very strong to very weak" while dilution fame is an either/or proposition – sufficient fame for dilution either exists or does not exist. *Id. See also Carefirst of Maryland Inc. v. FirstHealth of the Carolinas Inc.,* 77 USPQ2d 1492, 1507 (TTAB 2005)(likelihood of confusion "Fame is relative . . . not absolute"). A mark, therefore, may have acquired sufficient public recognition and renown to be famous for purposes of likelihood of confusion without meeting the more stringent requirement for dilution fame. *Toro Co. v. ToroHead Inc., supra, citing I.P. Lund Trading ApS v. Kohler Co.,* 163 F.3d 27, 47 USPQ2d 1225, 1239 (1st

Cir. 1998)("[T]he standard for fame and distinctiveness required to obtain anti-dilution protection is more rigorous than that required to seek infringement protection"). In order to help keep the concepts of likelihood of confusion fame and dilution fame distinct, we will refer to "public recognition and renown" when referring to likelihood of confusion fame. *Toro Co. v. ToroHead Inc., supra.*

The evidence of public recognition and renown consists of the following testimony and evidence:

1.  Opposer's sales of its "Gulp" line of fountain drinks have averaged in excess of $180,000,000 per year from 1985 through 2001;[47]

2.  Opposer has spent millions of dollars in advertising and promoting its "Gulp" line of products since 1983;[48]

3.  Opposer has placed various products from its "Gulp" line of drinks in television programs and movies such as Reality Bites, American Pie, and Pretty Woman.[49] The product placements have included BIG GULP, SUPER BIG GULP, X-TREME GULP, and GULP;[50]

---

[47] Ryckevic Dep., pp. 21-22; Exhibit 2; Opposer's Trial Brief, p. 4.
[48] Ryckevic Dep., pp. 35-36; Exhibit 8; Opposer's Trial Brief, p. 6.
[49] Ryckevic Dep., pp. 40-44; Exhibits 9, 10 and 14; Olsen Dep., pp. 22-26; Exhibits 27-33.
[50] Ryckevic Exhibit 9; Olsen Exhibits 28, 30, 32, and 34.

4.    References in numerous articles in newspapers and other publications.  The overwhelming majority of these articles refer to opposer's "Big Gulp" trademark.  A representative sample of the references includes the following:

a.    "Now the giant chain, which sells everything from its well-known Big Gulps, Slurpees and the usual convenience store fare . . ." Strategy (June 4, 2001);

b.    "BIG GULP BANKING A money order with your Slurpee?  7-Eleven is joining the convenience banking crowd."  Time (May 21, 2001);

c.    ". . . stores have known this for years and have enjoyed much success by offering high-taste, low-cost items such as the Big Gulp. This ubiquitous 32-ounce drink from 7-Eleven has become a common trademark alongside words such as Xerox and Kleenex."  The Arizona Republic (December 16, 1998);

d.    "Southland Corp.'s 7-Eleven, the chain that made Slurpee and Big Gulp household words, is a retail concept so ingrained in the national consciousness that its reach goes far beyond that of a typical retail store."  Discount Store News (December 14, 1998);

e.    "As every prudent driver knows, Big Gulps are served only at 7-Eleven."  The Arizona Republic (May 21, 1996); and,

f.    "The 7-Eleven Big Gulp has become the gold standard for cup holders."  The San Diego Union-Tribune (May 18, 1996).

5.    Some of the newspaper and magazine articles show a recognition by the authors that the BIG GULP trademark has become a symbol of American culture (*i.e.,* the tendency to excess).  The following references are illustrative:

20

a. "'The Big Gulp is a symbol of American haste and greed,' Stogner wrote in 1996." The Plain Dealer (November 20, 1998);

b. "A local 7-Eleven convenience store sold its first mammoth carton of soft drink and, with it, altered the sociological - not to mention gastroenterological – landscape of our time. The Big Gulp was the beginning of the large food craze that has given us serving sizes out of the Flintstones. Jacuzzis of popcorn. Bathospheres of cola." Bangor Daily News (September 23, 1998);

c. "Superlatives are a very big part of the American culture . . . That's why the 32-ounce Big Gulp and 64 [-ounce] Double Big Gulp at 7-Eleven is so popular." The Hartford Courant (July 18, 1998).

d. "You go to school to become educated, not to 'consume' education. Education is not a Big Gulp from 7-Eleven." The Orlando Sentinel (August 12, 1998); and,

e. "'What can I say? Americans are greedy; their eyes are bigger than their stomachs. Look at 7-Eleven's Big Gulp,' he said." The Washington Post (April 27, 1997); and,

6. In an undated market research study authorized by opposer "To assess the equities associated with the Big Gulp name," the BIG GULP trademark had a very high degree of public recognition.[51] The table below summarizes the BIG GULP unaided awareness study. [52]

---

[51] Ryckevic Dep., p. 46; Exhibit 12. The questionnaire used for the study is dated August 30, 1990. Accordingly, we will consider the study as having been conducted in 1990.

[52] Opposer did not provide any testimony regarding the results of the market research report identified by Ryckevic Deposition Exhibit 12, and the report itself did not explain what was meant by "unaided awareness." However, our review of the report indicates that as used in Exhibit 12, "unaided awareness" means awareness of the brand without prompting from the interviewer. See for example, question No. 2 in the questionnaire which reads

|  | Total Respondents | 7-Eleven Users | 7-Eleven Non-Users |
|---|---|---|---|
|  |  |  |  |
| Total Respondents | 201 | 125 | 76 |
|  |  |  |  |
|  | % | % | % |
|  |  |  |  |
| Gulp Names (Net) | 76 | 81 | 67 |
|  |  |  |  |
| BIG GULP | 73 | 78 | 64 |
|  |  |  |  |
| SUPER BIG GULP | 16 | 18 | 12 |
|  |  |  |  |
| DOUBLE GULP | 2 | 2 | 1 |

As a result of this evidence, particularly the market research study, we conclude that opposer's BIG GULP mark when used in connection with fountain soft drinks has a very high degree of public recognition and renown. On the other hand, the evidence does not show any significant public recognition and renown for opposer's GULP trademark or for any other variance of the "Gulp" trademarks.[53] Accordingly, with respect to only the BIG GULP trademark, we find that this *du Pont* factor favors opposer.

Even though we have found that opposer's BIG GULP trademark has a very high degree of public recognition and renown, this factor alone is not sufficient to establish a

_____

as follows: "Some places have developed their own names for items they carry, like Burger King named it's (sic) hamburger The Whopper. When you think of places that sell fountain soft drinks, what names for these fountain drinks can you think of?"
[53] We do not find support for opposer's argument that its family of "Gulp" marks, as opposed to its core mark BIG GULP, is "famous."

22

likelihood of confusion. As stated in past cases, if that were the case, ownership of a famous mark would entitle the owner to a right in gross, and that runs counter to the trademark laws. *Recot Inc. v. M.C. Becton, supra,* 54 USPQ2d at 1898 ("fame alone cannot overwhelm the other *du Pont* factors as a matter of law"); *University of Notre Dame du Lac v. J. C. Gourmet Food Imports Co.,* 703 F.2d 1372, 217 USPQ 505, 507 (Fed. Cir. 1983)("[T]he fame of the [plaintiff's] name is insufficient in itself to establish likelihood of confusion under §2(d)"). Therefore, we continue with our analysis of the other relevant *du Pont* factors.

C.    The similarity or dissimilarity of the goods.

Opposer has registered the BIG GULP and GULP trademarks for "soft drinks for consumption on or off the premises."[54] Opposer has added new products to its "Gulp" line such as X-TREME GULP for a 52-ounce insulated, refillable mug, CAR GULP for a mug that fits in a car cup holder, CANDY GULP for candy, GARDEN GULP for salads, and FRUIT GULP for a cup of fruit. Applicant is seeking to register his GULPY mark for "portable animal water dishes and animal water containers sold empty." Although these products are distinctly different, in analyzing the similarity or dissimilarity of

---

[54] Again we emphasize that in the context of soft drinks, the identification of goods refers to fountain drinks provided by opposer at its premises.

23

the products, it is not necessary that the products of the parties be similar or even competitive to support a finding of likelihood of confusion. Likelihood of confusion may be found if the respective products are related in some manner and/or if the circumstances surrounding their marketing are such that they could give rise to the mistaken belief that they emanate from the same source. *In re Pollio Dairy Products Corp.,* 8 USPQ2d 2012, 2015 (TTAB 1988); *Seaguard Corporation v. Seaward International, Inc.,* 223 USPQ 48, 51 (TTAB 1984).

In this regard, opposer contends as follows:

1. Both parties sell reusable portable beverage containers;

2. The products are complementary because water containers for pets may be used in conjunction with beverage containers for humans; and,

3. Opposer sells pet products (although none of the pet products use a "Gulp" trademark[55] and the products are limited to pet food and treats[56]).

Neither opposer's evidence nor its arguments persuade us that opposer's drinks, mugs, or other food items are related to applicant's portable animal water dishes. There is simply no evidence to support opposer's argument that

---

[55] Ryckevic Dep., pp. 54-55.
[56] Olsen Dep., pp. 27-28

portable animal water dishes are within opposer's natural area of expansion or that consumers would believe that such products emanate from a single source. For example, there is no evidence in the record that any companies use the same trademarks for products for human consumption and products for animal consumption or for accessories for animals. Accordingly, we find that the similarity or dissimilarity of the goods is a factor that favors applicant.

D.   Similarity or dissimilarity of trade channels.

Opposer contends that because applicant's products may be sold in convenience stores and because opposer sells pet products, the channels of trade overlap. However, we must recognize the following facts:  (i) opposer is a convenience store chain whose individual stores sell a wide variety of products including groceries, snacks, drugstore items, and sometimes gasoline; and (ii) the products at issue are of such diverse nature and utilized for such different purposes that even if all of the products are sold in opposer's convenience stores, consumers would not believe that they emanate from a single source. Under such circumstances, consumers would not believe there is any relationship between the products of the parties even if they were both sold in opposer's stores. The mere fact that two products may move in the same channels of trade to the same class of purchasers does not, *ipso facto*, prove that there is a

definite relationship between the two types of goods. *Champion International Corporation v. Genova, Inc.,* 199 USPQ 301, 305 (TTAB 1978). *See also, Recot Inc. v. M.C. Becton, supra,* 54 UPSQ2d at 1899 (although parties' goods are sold in some of the same channels of trade, including supermarkets and grocery stores, there is no *per se* rule that all products sold within supermarkets are related by virtue of being sold in same establishments). Even assuming that opposer sold applicant's products, opposer would make every effort to keep fountain drinks and pet accessories segregated because no retailer would want consumers to associate fountain drinks and pet accessories.

Based on the evidence of record, the similarity or dissimilarity of the channels of trade is a neutral factor.

E.   The conditions under which and buyers to whom sales are made.

The parties' respective products are relatively inexpensive. Applicant's portable pet water containers have a suggested retail price of $10.99 and opposer's products are relatively inexpensive fountain soft drinks. Opposer's X-TREME GULP 52-ounce, refillable mug costs $4.[57] "As with the standard of the reasonable person in negligence cases, the discernment exercised by a reasonably prudent purchaser

---

[57] Ryckevic Dep., p. 23.

varies with the circumstances.  One can expect, for example, more careful inquiry in purchasers of expensive rather than inexpensive items."  Restatement (Third) of Unfair Competition §20, comment h (1995).  Therefore, when products are relatively low-priced and subject to impulse buying, the risk of likelihood of confusion is increased.  *Recot Inc. v. M.C. Becton, supra,* 54 UPSQ2d at 1899.  In view thereof, this factor weighs in favor of opposer.

F.    The similarity or dissimilarity of the marks.

We now turn to the *du Pont* factor focusing on the similarity or dissimilarity of the marks in their entireties as to appearance, sound, connotation, and commercial impression.  *In re E. I. du Pont de Nemours and Co., supra.* The test is not whether the marks can be distinguished when subjected to a side-by-side comparison, but rather whether the marks are sufficiently similar in terms of their overall commercial impression so that confusion as to the source of the goods offered under the respective marks is likely to result.  *San Fernando Electric Mfg. Co. v. JFD Electronics Components Corp.,* 565 F.2d 683, 196 USPQ 1, 3 (CCPA 1977); *Spoons Restaurants Inc. v. Morrison Inc.,* 23 USPQ2d 1735, 1741 (TTAB 1991), *aff'd unpublished,* No. 92-1086 (Fed.Cir. June 5, 1992).

Notwithstanding that applicant's mark GULPY is derived from the word "Gulp" used by opposer as its family surname,

the fact remains that "Gulp" is an ordinary word found in the dictionary, and that it is suggestive of opposer's fountain drinks (*i.e.,* the manner in which one may swallow opposer's soft drinks or, in the case of BIG GULP, a big swallow). As we indicated *supra,* the mark GULPY, by contrast, appears to be a coined term, and because it is applied to portable pet water dispensers, it engenders a different commercial impression - - perhaps, a playful puppy lapping water or of a pet's name - - [58] from opposer's GULP and BIG GULP marks for fountain drinks. Contrary to opposer's argument that consumers will view GULPY as a diminutive for "Gulp,"[59] we believe that the existence of one mark consisting of an ordinary word contrasted with an unfamiliar term with a different commercial impression results in the marks being sufficiently distinguishable, when compared in their entireties, despite any similarities

---

[58] The significance of a mark is not determined in the abstract, but in connection with the goods to which the mark is applied and the context in which it is used because that is how purchasers encounter the mark. *Presto Products v. Nick-Pak Products,* 9 USPQ2d 1895, 1897 (TTAB 1988). In this case, applicant's packaging reinforces the difference in the commercial impressions. The front of the GULPY pet water dispenser package features a drawing of a dog using the product. The back of the package features a photograph of a dog using the product. Wechsler Dep., Exhibit 3. The same drawing and photograph are featured in applicant's website. Wechsler Dep., Exhibit 2.

[59] Opposer has referred to smaller containers as MINI GULP. Ryckevic Dep., p. p. 14. There is no evidence of record that opposer has ever used a suffix with the word "Gulp" to indicate size.

in appearance or sound.[60]  In other words, the familiar ("Gulp") is readily distinguishable from the unfamiliar ("Gulpy").  *Jacobs v. International Multifoods Corp.,* 668 F.2d 1234, 212 USPQ 641 (CCPA 1982)(no likelihood of confusion between BOSTON SEA PARTY for restaurant services and BOSTON TEA PARTY for tea); *In re General Electric Co.,* 304 F.2d 688, 134 UPSQ 190 (CCPA 1962)(no likelihood of confusion between VULKENE for electrical wires and cables and VULCAN for electric building wires); *Payot v. Southwestern Classics,* 3 USPQ2d 1600 (TTAB 1987)(no likelihood of confusion between PAYOT for cosmetics and toiletries and PEYOTE for men's cologne).  Accordingly, we find that the differences in the connotation and commercial impression engendered by GULP and BIG GULP, on the one hand, and GULPY, on the other, outweigh any similarities in the appearance and sound of the marks.

In view of the foregoing, we find that the similarity or dissimilarity of the marks weighs in favor of applicant.

G.   Balancing the factors.

While the mark BIG GULP has a high degree of public recognition and renown, at least insofar as it relates to

---

[60] Similarity in any one of the appearance, sound, meaning, and commercial impression factors may be sufficient to indicate that the marks are similar, but it does not require that conclusion where there are significant differences in one or more of the other factors. *Kabushiki Kaisha Hattori Seiko v. Satellite Int'l, Ltd.,* 25 USPQ2d 1317, 1318 (TTAB 1991), *aff'd without opinion,* 979 F.2d 216 (Fed. Cir. 1992).

soft drinks, its "fame" is insufficient in and of itself to establish a likelihood of confusion under Section 2(d) of the Lanham Act. *Recot Inc. v. M.C. Becton, supra,* 54 USPQ2d at 1898; *University of Notre Dame du Lac v. J. C. Gourmet Food Imports Co., supra,* 217 USPQ at 507. There must be a reasonable basis for the public to attribute applicant's portable animal water dishes to opposer and its BIG GULP trademark. *University of du Lac v. J. C. Gourmet Food Imports Co., supra. See also Dymo Industries, Inc. v. Schramm, Inc.,* 181 USPQ 540, 541-542 (TTAB 1974); *American Optical Corporation v. Autotrol Corporation,* 175 USPQ 725, 729 (TTAB 1972). "The 'famous mark' argument is less persuasive where, as here, (i) there are significant differences between the mark whose fame is asserted and the mark which is alleged to [be] confusingly similar and (ii) there is no persuasive rationale asserted nor evidence offered to support a finding that the famous mark would likely be associated in the minds of purchasers with the mark challenged." *Land O'Lakes, Inc. v. Land O'Frost, Inc.,* 224 USPQ 1022, 1026-1027 (TTAB 1984).

It is apparent from the record that the parties use their marks in different fields and, notwithstanding that both parties sell products to the general public, there is no interplay or relationship between them that creates a situation from which confusion arises. There are common

customers, but in a realistic appraisal of the situation it is doubtful that opposer's customers, under the normal conditions and circumstances surrounding the sale and consumption of fountain drinks, would associate opposer with portable animal water dishes which they would encounter generally in a different marketing milieu and purchase with different motivations and considerations. The differences between the parties' products and the marks under which they are sold more than offset the public recognition and renown of opposer's mark BIG GULP and, therefore, serve to negate any likelihood of confusion.

In reaching this conclusion, we are cognizant of the decisions of our reviewing court in *Recot Inc. v. M.C. Becton, supra* and *Kenner Parker Toys Inc. v. Rose Art Industries Inc., supra*. As instructed by the Court in *Recot,* we have given full consideration to the appearance, sound, meaning, and commercial impression factors of the marks in reaching our conclusion that the different commercial impressions of the marks outweigh the similarities in the sound and appearance. In addition, in *Recot*, the Board failed to consider the testimony of both parties' witnesses that several companies produce and sell both pet and human foods. In this case, however, there is no evidence that any companies produce and sell both fountain drinks and pet accessories or pet foods (let alone

31

that any companies sell such products under the same or similar marks), or any other credible evidence that fountain drinks and portable animal water dishes are related in the mind of the consuming public as to the origin of the goods.

In *Kenner Parker Toys,* the Court said that the Board incorrectly reasoned that because opposer's mark was famous, consumers would more easily recognize the differences between the marks and, therefore, incorrectly concluded that fame permitted greater, rather than less, tolerance for similar marks. This skewed the analysis of the *du Pont* factors. In *Kenner Parker Toys,* the Court found FUNDOUGH and PLAY-DOH engendered very similar impressions. On the other hand, in this case, we find that BIG GULP and GULPY create different commercial impressions. In addition, *Kenner Parker Toys* involved identical products, modeling compounds and related modeling accessories, while this case involves disparate products. Finally, in *Kenner Parker Toys,* the court noted that the trade dress of the parties added to the similarity of the marks, whereas here, the trade dress emphasizes the differences between the marks.

In view of the foregoing, we find that applicant's mark GULPY, when used in connection with "portable animal water dishes and animal water containers sold empty" does <u>not</u> so resemble BIG GULP, GULP, or any of opposer's other "Gulp"

32

marks as to be likely to cause confusion, to cause mistake, or to deceive.

Dilution

In addition to its Section 2(d) claim, opposer has asserted a dilution claim. The Lanham Act provides for a cause of action for the dilution of famous marks. Sections 13 and 43(c) of the Lanham Act, 15 U.S.C. §§1063 and 1125(c).

The Lanham Act provides as follows:[61]

> Subject to the principles of equity, the owner of a famous mark that is distinctive, inherently or through acquired distinctiveness, shall be entitled to an injunction against another person who, at any time after the owner's mark has become famous, commences use of a mark or trade name in commerce that is likely to cause dilution by blurring or dilution by tarnishment of the famous mark, regardless of the presence or absence of actual or likely confusion, of competition, or of actual economic injury.

Opposer contends that applicant's mark will "blur" the distinctiveness of opposer's "Gulp" marks.[62] The Lanham Act defines dilution by blurring as follows:

> "dilution by blurring" is association arising from the similarity between a mark or trade name and a famous mark

---

[61] Section 43(c) as it pertains to dilution has been amended effective October 6, 2006.
[62] Opposer's Brief, p. 30.

that impairs the distinctiveness of the famous mark.[63]

Since we have already determined that only opposer's BIG GULP mark has a high degree of public recognition and renown (*i.e.,* "fame") for purposes of likelihood of confusion, and because the requirements for proving fame for dilution are more stringent than the requirements for proving "fame" for likelihood of confusion, we limit our dilution analysis to opposer's BIG GULP trademark. *Toro Co. v. ToroHead Inc., supra,* 61 UPSQ2d at 1170; *NASDAQ Stock Market Inc. v. Antartica S.r.l.,* 69 USPQ2d 1718, 1736-1737 (TTAB 1998).

Our dilution analysis, therefore, requires consideration of the following issues:

1.   Whether BIG GULP is a famous mark;

2.   Whether BIG GULP became famous prior to the filing date of applicant's GULPY trademark application; and,

3.   Whether GULPY is likely to cause dilution by blurring of the distinctiveness of BIG GULP.

A.   The fame of opposer's mark.

In *Toro,* we described the requirements for proving that a mark is famous:

> While the eight statutory factors are a guide to determine whether a mark is famous, ultimately we must consider all the evidence to determine whether opposer has met its burden in

---

[63] Section 43(c)(2)(B) of the Lanham Act, 15 U.S.C. §1125(c)(2)(B).

demonstrating that the relevant public recognizes the {BIG GULP} mark as "signifying something unique, singular, or particular." H.R. REP. No. 104-374, at 3 (1995). Because famous marks can be diluted by the use of similar marks on non-competitive goods and services, the owner of a famous mark must show that there is a powerful consumer association between the term and the owner.

\* \* \* \*

Fame for dilution purposes is difficult to prove.

\* \* \* \*

Therefore, an opposer . . . must provide evidence that when the public encounters opposer's mark in almost any context, it associates the term, at least initially with the mark's owner. . . . Examples of evidence that show the transformation of a term into a truly famous mark include:

1. Recognition by the other party.

2. Intense media attention.

3. Surveys.

\* \* \* \*

But in order to prevail on the ground of dilution the owner of a mark alleged to be famous must show a change has occurred in the public's perception of the term such that it is now primarily associated with the owner of the mark even when it is considered outside of the context of the owner's goods or services.

*Toro Co. v. ToroHead Inc., supra,* 61 USPQ2d at 1180-1181

(internal citations omitted).

35

Opposer's evidence regarding fame is recounted *supra* at pages 17-23.[64] In our opinion, BIG GULP has acquired the fame necessary to support a dilution claim as evidenced by extensive media attention, particularly those references identifying the mark as a symbol of American culture,[65] and the market research study evidencing a 73% unaided awareness among all consumers (including non-users of opposer's services).[66]

In concluding that BIG GULP has met the stringent requirements of a famous mark, we note that applicant's

---

[64] In the case of an intent-to-use application, the owner of the famous mark must prove that its mark became famous prior to the filing date of the applicant's application. *Toro Co. v. ToroHead Inc., supra,* 61 USPQ2d at 1180-1174. Accordingly, for purposes of this analysis, we only considered evidence prior to August 27, 1998, the filing date of applicant's application. In so doing, we prorated advertising and sales figures through August, 1998, and with certain exceptions, we did not consider printed publications after August 27, 1998. Finally, we did not consider opposer's notice of reliance regarding the number of people who saw films in which opposer had made BIG GULP product placements because the purported evidence is hearsay and the printed publications provided revenue figures rather than a head count.

[65] We considered some post-August 27, 1998 printed publications to the extent that the authors recounted events that occurred in prior years. For example, in The Plain Dealer article "Americans Biting Off More Than They Should" (November 20, 1998), the author reported that University of Michigan psychologist Brian Stogner wrote in 1996 that "The Big Gulp is a symbol of American haste and greed."

[66] We hasten to add that a market study evidencing a high level of unaided consumer awareness of opposer's mark will not necessarily be sufficient to prove fame for purposes of dilution in all cases. We can envision circumstances in which the market study results are subject to challenge based on flaws in the survey methodology or in which the market study results may be subject to different interpretations. However, because the applicant in this case did not challenge opposer's study and because opposer used the study in its regular course of business, we accept the results for their face value.

evidence of fame is similar to the quantum and quality of evidence introduced in *NASDAQ Stock Market Inc. v. Antartica S.r.l., supra,* that was found sufficient to prove that opposer's mark was famous for dilution purposes. In *NASDAQ Stock Market Inc.,* opposer introduced market studies demonstrating that the awareness of opposer's stock market among investors reached more than 80% in 1999. That evidence is analogous to the market research study in this case that evidenced an unaided awareness of the BIG GULP brand by 73% of all consumers, including non-users of opposer's services. In addition, the opposer in *NASDAQ Stock Market Inc.* introduced dictionary references, newspaper and magazine articles, and stock market reports that evidenced a widespread recognition of opposer's mark, beyond just investors. This is analogous to the media evidence introduced by opposer herein that likewise show a widespread recognition of opposer's mark, especially the newspaper articles where the writers referred to BIG GULP as a symbol of American culture.[67]

In view of the foregoing, we find that opposer has established that BIG GULP is famous for dilution purposes.

---

[67] Applicant contends that the "iconic nature of BIG GULP" relates to American overindulgence of consumable products and presumably is not probative of fame in general. Applicant's Brief, p. 4. That reporters may use the BIG GULP trademark as a symbol of the American public's "Super Size" eating habits is indicative of the fact that the mark has achieved recognition beyond soft drinks.

B.  Opposer's mark became famous prior to the filing date of applicant's application.

As indicated in footnote 64, in the case of an intent to use application, the owner of the famous mark must prove that its mark became famous prior to the filing date of the applicant's application. *Toro Co. v. ToroHead Inc., supra,* 61 USPQ2d at 1174.  In this case, all of the evidence on which we relied to find that BIG GULP is famous predates the filing date of the GULPY trademark application.

C.  Dilution by blurring.

"Dilution diminishes the 'selling power that a distinctive mark or name with favorable associations has engendered for a product in the mind of the consuming public.'"  *Toro Co. v. ToroHead Inc., supra,* 61 USPQ2d at 1182, *quoting Sally Gee, Inc. v. Myra Hogan, Inc.,* 699 F.2d 621, 624-25, 217 UPSQ 658, 661 (2nd Cir. 1983).  Dilution by blurring occurs when a substantial percentage of consumers, upon seeing the junior party's use of a mark on its goods [in this case GULPY used in connection with portable pet water dishes], are immediately reminded of the famous mark [in this case BIG GULP] and associate the junior party's use with the owner of the famous mark, even if they do not believe that the goods come from the famous mark's owner. *Toro Co. v. ToroHead Inc., supra,* 61 USPQ2d at 1183.

The Board may look to all relevant facts in determining whether applicant's GULPY trademark will blur the

38

distinctiveness of opposer's BIG GULP mark.  The Lanham Act

provides the following guidance:

> In determining whether a mark or trade name is likely to cause dilution by blurring, the court may consider all relevant factors, including the following:
>
> (i) The degree of similarity between the mark or trade name and the famous mark.
>
> (ii) The degree of inherent or acquired distinctiveness of the famous mark.
>
> (iii) The extent to which the owner of the famous mark is engaging in substantially exclusive use of the mark.
>
> (iv) The degree of recognition of the famous mark.
>
> (v) Whether the user of the mark or trade name intended to create an association with the famous mark.
>
> (vi) Any actual association between the mark or trade name and the famous mark.[68]

1. <u>The degree of similarity between the mark or trade name and the famous mark</u>.

For purposes of dilution, a party must prove more than

confusing similarity; it must show that the marks are

"identical or very substantially similar."  *Carefirst of*

---

[68] *Id.*  Prior to the October 6, 2006 amendment to Section 43(c) of the Lanham Act, the Board considered the following factors in analyzing dilution by blurring:  (1) the similarity of the marks; (2) the renown of the senior party; and, (3) whether target customers are likely to associate two different products with the mark even if they are not confused as to the different origins of those products.  *Toro Co. v. ToroHead Inc., supra,* 61 USPQ2d at 1183; *NASDAQ Stock Market Inc. v. Antartica S.r.l., supra,* 61 USPQ2d at 1737.

*Maryland Inc. v. FirstHealth of the Carolinas Inc., supra,* 77 USPQ2d at 1514, *quoting Toro Co. v. ToroHead, Inc., supra,* 61 USPQ2d at 1183. As the Board explained in *Toro Co. v. ToroHead, Inc.*:

> The test for blurring is not the same as for determining whether two marks are confusingly similar for likelihood of confusion purposes. "To support an action for dilution by blurring, 'the marks must be similar enough that a significant segment of the target group sees the two marks as essentially the same.'" *Luigino's, Inc.,* 170 F.3d at 832, 50 USPQ2d at 1051[69] (quoting 2 McCarthy on Trademarks and Unfair Competition, §24:90.1 (4th ed. 1998). Therefore, differences between the marks are often significant. Mead Data (LEXUS for cars did not dilute LEXIS for database services).[70]

*Toro Co. v. ToroHead, Inc., supra,* 61 USPQ2d at 1183 (TORO and ToroMR and Design are not substantially similar for dilution purposes).

Because applicant's mark GULPY engenders a different commercial impression than opposer's BIG GULP mark, we do not see these marks as being essentially the same. In discussing likelihood of confusion, we found that GULPY and BIG GULP are not similar. Given that finding of fact, in the context of dilution, we must also find that the marks are not substantially similar. Therefore, the similarity,

---

[69] *Luigino's , Inc. v. Stouffer Corp.,* 170 F.3d 827, 50 USPQ2d 1047 (8th Cir. 1999).
[70] *Mead Data Central, Inc. v. Toyota Motor Sales, U.S.A., Inc.,* 875 F.2d 1065, 10 USPQ2d 1961 (2nd Cir. 1989).

or in this case, dissimilarity of the marks heavily favors applicant.

2. <u>The degree of inherent or acquired distinctiveness of the famous mark.</u>

BIG GULP is an inherently distinctive trademark when used in connection with fountain soft drinks. It is suggestive to the extent that it implies that one will drink opposer's products in big swallows. Accordingly, because BIG GULP is suggestive, this is a dilution factor that slightly favors opposer.

3. <u>The extent to which the owner of the famous mark is engaging in substantially exclusive use of the mark</u>.

While applicant submitted evidence of third-party use of various "Gulp" trademarks, applicant did not introduce any evidence as to the extent of the third-parties' use and promotion of their marks. Without such evidence, we cannot assess whether third-party use has been so widespread as to have had any impact on consumer perceptions. *Cf. National Motor Bearing Co. v. James-Pond Clark,* 266 F.2d 709, 121 USPQ 515, 517 (CCPA 1959)("evidence of present third party usage . . . indicates a conditioning of the public mind to the common feature, thereby decreasing any likelihood of confusion"); *Freedom Federal Savings & Loan Ass'n v. Heritage Federal Savings & Loan Ass'n,* 210 USPQ 227, 231 (TTAB 1981)(third party use of marks without more is not probative of the impact that such marks have on consumer

perceptions). Accordingly, on this record, we conclude that opposer has made substantially exclusive use of the BIG GULP trademark, and therefore, this dilution factor favors opposer.

    4. <u>The degree of recognition of the famous mark</u>.

This Congressionally mandated factor seems redundant in view of the fact that opposer must establish that its mark is famous as a prerequisite for establishing a dilution claim. Nevertheless, it is a factor that we must consider in order to give meaning to the words in the statute. We conclude, therefore, that the degree of recognition of the famous mark requires us to determine the level of fame acquired by the famous mark. In other words, once the mark is determined to be famous as a prerequisite for dilution protection, we must apply a sliding scale to determine the extent of that protection (*i.e.,* the more famous the mark, the more likely there will be an association between the famous mark and the defendant's mark).

While we have previously found that BIG GULP is a famous mark for dilution purposes, there is insufficient evidence to demonstrate that BIG GULP has acquired an extraordinary degree of recognition relative to other famous marks. Accordingly, we find that this dilution factor is neutral.

5. <u>Whether the user of the mark or trade name intended to create an association with the famous mark</u>.

Opposer failed to present any evidence demonstrating that applicant intended to create an association with the BIG GULP trademark. In view thereof, this dilution factor favors applicant.

6. <u>Any actual association between the mark or trade name and the famous mark</u>.

Opposer failed to present any evidence demonstrating that there is any actual association between applicant's GULPY trademark and opposer's BIG GULP trademark. Since we have no evidence on which to conclude that potential customers of applicant's products would make any association between the parties' marks when used on their respective products, this dilution factor favors applicant.

7. <u>Balancing the factors</u>.

The facts that the marks are not so substantially similar as to support a dilution claim, that there is no evidence demonstrating any association between the parties' marks, and that there is no evidence that applicant intended to create an association with opposer's mark far outweigh the fame, distinctiveness, and substantially exclusive use of the BIG GULP trademark. Based on the record before us, opposer has not demonstrated that the registration of applicant's mark will dilute its BIG GULP trademark.

Decision:  The opposition to the registration of applicant's mark is dismissed.